IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| RAYMOND F. DEISS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 04-380 Erie |
| ) | |
| JO ANNE B. BARNHART, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION

McLAUGHLIN, J.

  Plaintiff, Raymond F. Deiss, (hereinafter "Plaintiff" or "Deiss"), commenced the instant action pursuant to 42 U.S.C. §§ 405(g) seeking judicial review of the final decision of the Commissioner of Social Security denying his application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq*. Deiss filed an application for DIB on August 24, 2000, alleging that he was disabled since September 1, 1996 due to rheumatoid arthritis, degenerative joint disease of the lumbar and cervical spine, gastrointestinal disorders, and chronic ischemia (Administrative Record, hereinafter "AR", at 92-94, 108).[1] His application was denied on February 5, 2001 (AR 67-72). Deiss requested a hearing before an administrative law judge ("ALJ"), and a hearing was held on November 6, 2001 (AR 31-66). Following this hearing, the ALJ found that Deiss was not entitled to a period of disability or disability insurance benefits under the Act (AR 19-26). Deiss' request for review by the Appeals Council was denied (AR 6-10), rendering the Commissioner's decision final under 42 U.S.C. § 405(g). The instant action challenges the ALJ's decision. Presently pending

---

[1] Deiss previously filed an application for DIB on July 23, 1997 alleging disability since September 1, 1996, which was denied by an ALJ on January 12, 1999 (AR 19). The Appeals Council affirmed the decision, and Deiss did not appeal that determination (AR 19). Both parties agree that for purposes of the instant appeal, Deiss' onset date is January 13, 1999, the day after the prior ALJ's denial. *Plaintiff's Brief* p. 1.

1

before the Court are cross-motions for summary judgment. For the reasons set forth below, we will deny both motions.

## I. BACKGROUND

Deiss was born on July 20, 1939 was sixty-two years old at the time of the ALJ's decision (AR 20, 92). He has a college education and past work experience as a high school guidance counselor (AR 109). He reported that his job involved testing and counseling students, advising teachers, and using a computer for four to five hours a day (AR 109).

The medical evidence shows that Deiss had a history of an acute inferior myocardial infarction in December 1998, for which he underwent cardiac catheterization, angioplasty, and coronary stenting (AR 153-236). On January 29, 1999, Sunder R. Rao, M.D. reported that Deiss felt well and had no recurrent symptoms following surgery (AR 259-260).

Deiss was also treated by Kreig Spahn, D.O. since 1998 for degenerative joint disease of his lumbar and cervical spine, rheumatoid arthritis affecting his fingers, coronary artery disease, hypertension, hyperlipidemia, and diverticulosis coli (AR 523). An MRI of Deiss' lumbosacral spine performed on November 2, 1999 showed degenerative changes of the spine with levoscoliosis and a decrease in the volume in the AP diameter of the spinal canal (AR 318-319). A radionuclide lumbar bone SPECT conducted on November 11, 1999 showed findings compatible with facette arthropathy at the L3-4 level bilaterally (AR 317).

Deiss returned to Dr. Rao for follow-up on November 17, 1999, who reported that he was doing exceedingly well with no recurrence of angina (AR 257).

Also on November 17, 1999, Deiss was examined by Robert Concilus, M.D. for complaints of back pain and bilateral leg pain (AR 442). On physical examination, Dr. Concilus reported that Deiss had normal curvature of the lumbar spine (AR 443). A neurologic examination showed that sensation and strength were intact and a straight leg raising test was negative (AR 443). His lumbar range of motion and flexion was "quite limited," and there was some paravertebral tenderness noted (AR 443). Dr. Concilus observed changes in the fingers of

both hands consistent with arthritis (AR 443). Dr. Concilus diagnosed Deiss with symptoms of back and leg pain consistent with lumbar radiculopathy, and recommended a series of epidural injections and an evaluation for physical therapy (AR 443). On November 22, 1999, Deiss returned to Dr. Concilus and received an epidural and trigger point injection (AR 311).

On December 28, 1999, Deiss reported that the first epidural injection was very beneficial, but the second injection as ineffective (AR 307). He was undergoing physical therapy, but still reported significant pain (AR 307). On physical examination, no tenderness was noted to the lumbar spine, and Dr. Concilus administered another steroid injection (AR 307).

When seen by Dr. Spahn on March 1, 2000 a physical examination showed Deiss' grip strength was equal, he was able to heel and toe walk, and could squat and stand without problems (AR 356).

Deiss underwent an electrodiagnostic consultation by Edward D. Reidy, M.D., on March 29, 2000 (AR 238-239). Physical examination revealed symmetric reflexes and well-preserved strength in the bilateral upper extremities, with some sensory loss to pinprick in a C6 distribution in the right upper extremity (AR 238). Dr. Reidy diagnosed acute cervical radiculopathy, which he characterized as clinically and electrophysically mild and improving, and recommended Deiss continue taking Vioxx (AR 239).

In June 2000, Dr. Rao reported that Deiss was doing exceedingly well, was exercising, had lost weight and essentially felt healthy (AR 256). Dr. Rao concluded that he was doing well on medical therapy and recommended no further non-invasive cardiac testing (AR 256).

On August 7, 2000, Deiss returned to Dr. Concilus complaining of low back and leg pain (AR 304). He reportedly had responded well to three epidural injections and back exercises, but had recently developed pain (AR 304). Dr. Concilus noted that it was unclear why Deiss had discontinued his home exercise program, and strongly encouraged him to continue the exercises on a regular basis (AR 304). On physical examination, tenderness was noted on palpation of the spinous process in the lumbosacral spine (AR 304). Dr. Concilus administered another steroid

injection (AR 304).

When seen by Dr. Concilus on September 5, 2000, Deiss reported that epidural injections had significantly helped with his leg pain, but he continued to have back pain (AR 302). Dr. Concilus administered an epidural and trigger point injections, encouraged physical therapy, and indicated that further evaluation would be considered depending upon how Deiss responded to treatment (AR 302).

On October 17, 2000, Deiss was seen by M. Bruce Dratler, M.D. for complaints of abdominal pain after eating with bloating, and bleeding from his rectum (AR 330). Dr. Dratler ordered a EGD and colonoscopy in order to evaluate Deiss' condition (AR 330). Tests performed on October 24, 2000 showed inflammatory changes involving the rectosigmoid and sigmoid colon (AR 332-333). Biopsy specimens showed mild to moderate nonspecific chronic inflammation of the right colon, and mild nonspecific chronic inflammation of the sigmoid colon (AR 335).

Deiss underwent a consultative examination performed by Alexandra Hope, M.D. on November 1, 2000 (AR 339-343). He reported an onset of rheumatoid arthritis in 1990 for which he was currently being treated with Vioxx (AR 339). He indicated that his symptoms had stabilized and his deformities stopped developing after he stopped using a computer at work (AR 339). His hands had not bothered him for the past two years, but he reported intermittent swelling following activities such as home repair and gardening (AR 340). He had difficulty with buttons and opening jar lids (AR 340). Deiss also reported a history of a myocardial infarction, a left torn rotator cuff, low back and cervical pain (AR 339-340). Monthly injections helped his back pain, and his neck pain decreased spontaneously (AR 339). Deiss reported that his neck had not bothered him for the past two to three months (AR 340). He claimed that his upper extremities felt diffusely weak, with occasional tingling (AR 340). He suffered from intermittent, sharp, severe pain across his low back radiating to his buttocks, as well as to his posterior thighs to the knee level (AR 340). He was able to walk 15 to 20 minutes at a time, sit

with position changes to alleviate leg numbness, and carry a bag of groceries (AR 340). He was independent in his daily activities, but used a cane for walking long distances (AR 340).

A physical examination revealed tightness of the cervical muscles and tenderness over the thumbs (AR 341). Dr. Hope observed boutonniere deformities of the index and little fingers bilaterally, with early changes in the ring fingers (AR 341). Heberden's nodes were present bilaterally (AR 341). Fine motor coordination in both hands was slightly diminished (AR 342). Light touch sensation was intact and symmetrical (AR 342). Dr. Hope reported the following results of Deiss' range of motion for his hands: out of a possible 100º, flexion/extension of the proximal interphalangeal joint was 90º on the right and 45º on the left; out of a possible 90º, flexion of the metacarpophalangeal joint was 60º on the right and 55º on the left; out of a possible 45º, extension of the metacarpophalangeal joint was 30º bilaterally; out of a possible 90º, flexion of the distal interphalangeal joint was 35º on the right and 45º on the left, and extension was 0º bilaterally (AR 348). With respect to Deiss' thumbs, Dr. Hope reported that out of a possible 90º, flexion of his interphalangeal joint was 55º on the right and 50º degrees on the left; out of a possible 20º, extension was 10º bilaterally; out of a possible 50º, flexion/extension of the metacarpophalangeal joint was 25-65º on the right and 40º on the left (AR 349).

Dr. Hope noted that Deiss sat well, had a normal sit to stand transition and a normal gait pattern (AR 342). He was able to heel walk, toe walk, and deep knee bend (AR 343). Dr. Hope formed an impression of a history of rheumatoid arthritis with joint deformities of the hand, degenerative arthritis of the hands, spine and feet, chronic left rotator cuff tear, a history of cervical radiculopathy, and coronary artery disease with a history of myocardial infarction (AR 342).

Dr. Hope concluded that Deiss could lift two to three pounds occasionally and sit for four hours, alternation sitting and standing at his option (AR 344-345). He had limitations in pushing and pulling and in postural activities (AR 344-345). He could not perform repetitive reaching with the left upper extremity, downward reaching with either hand, or handling or fingering (AR

344-345). Dr. Hope opined that his prognosis for recovery and improvement was poor, and that his prognosis for returning to this former line of work was poor (AR 342). She noted that Deiss had limited use of his hands due to the superimposed deformities of the rheumatoid arthritis and osteoarthritis (AR 342).

In January 2001, Deiss underwent a treadmill exercise test which was negative at 85 percent predicted heart rate without any associated ischemic ST segment changes or chest pain (AR 425-526). A stress cardiolite myocardial spect scan was abnormal for the probable inferior infarct, but showed no ischemia and there was a normal ejection fraction (AR 424-424).

When seen by Dr. Concilus in January 2001, Deiss complained of back pain with some benefit from previous epidural injections (AR 464). Dr. Concilus noted that Deiss had documented facet disease at the L3-4 level bilaterally with persistent back pain that was "problematic" (AR 464). Dr. Concilus performed facet blocks at L3-4 and L4-5 bilaterally, and considered Deiss a candidate for radiofrequency treatment depending upon his response (AR 464).

On January 22, 2001, a CT scan of Deiss' abdomen and pelvis showed diverticulosis of the sigmoid colon (AR 469).

On January 29, 2001, V. Rama Kumar, a non-examining state agency reviewing physician reviewed the medical evidence of record and completed a Residual Functional Capacity Assessment form (AR 428-435). Dr. Kumar concluded that Deiss could lift and/or carry twenty pounds occasionally and ten pounds frequently; could stand, walk and/or sit about six hours in an eight-hour workday; had some limitations in his handling and fingering abilities, could occasionally climb, stoop and crouch, but never balance, kneel or crawl; and had no visual, communicative or environmental limitations (AR 429-432). Dr. Kumar opined that Dr. Hope's findings in November 2000 did not support the restrictions imposed in her assessment (AR 434).

An x-ray of Deiss' cervical spine conducted on February 7, 2001 showed straightening of the normal cervical lordosis with focal spondylosis at the C5-6 level (AR 462).

Deiss returned to Dr. Concilus on March 13, 2001 complaining of back pain (AR 463). He reported that epidural injections provided him complete relief for three days with improved pain for at least a week (AR 463). Dr. Concilus performed a radiofrequency neurolysis at the posterior division nerve at L3, L4 and L5 bilaterally (AR 463).

In April 2001, Deiss reported that the radiofrequency treatment did not help, and he had back and leg pain (AR 539). He reported a new complaint of right arm pain with intermittent numbness (AR 539). On physical examination, Dr. Concilus reported that he had good vascular supply to the right upper extremity, and his arm appeared warm and pink (AR 539). He had normal strength, and there was minimal tenderness to palpation of the spinous processes of the cervical spine, with no lymphadenopathy noted (AR 539). Dr. Concilus performed a bilateral steroid injection and prescribed Neurontin (AR 539). Deiss was to continue with narcotic analgesics as needed, and Dr. Concilus noted that his prognosis was somewhat guarded (AR 539).

In June 2001, Dr. Rao opined that Deiss was doing well from a cardiac standpoint and had no symptoms of angina (AR 542-543).

Deiss was admitted to the hospital on July 2, 2001 with a chief complaint of rectal bleeding (AR 547). He reportedly had become dizzy when using the restroom and had passed out for an undetermined period of time (AR 547). Because of his cardiac status and low hemoglobin, Deiss underwent a blood transfusion (AR 547). He tolerated the transfusion without problem and was discharged for outpatient therapy (AR 545). Tests performed while in the hospital did not reveal any significant findings other than diverticulosis (AR 545). His discharge diagnosis was acute diverticular hemorrhage with blood loss anemia requiring transfusion, gastroesophageal reflux disease, coronary artery disease, hypertension, degenerative joint disease of the spine, osteoarthritis of the spine, and rheumatoid arthritis (AR 545).

Finally, on July 22, 2001, Dr. Spahn concluded that due to Deiss' degenerative joint disease, rheumatoid arthritis of the fingers, cardiac condition, hypertension and diverticulosis,

Deiss could only sit for four hours and stand or walk for one hour in an eight-hour workday (AR 523-530).  He could lift ten to twenty pounds occasionally and five to ten pounds frequently; had moderate limitations in his ability to grasp, turn, and twist objects; and no ability to use his fingers for fine manipulation (AR 527).  Dr. Spahn further opined that writing and typing would be difficult due to Deiss' severe arthritis of his fingers (AR 526).

Deiss and Joseph Kuhar, a vocational expert, testified at the hearing held by the ALJ on November 6, 2001 (AR 31-66).  Deiss testified that he suffered from arthritis which caused pain at the base of his spine and radiated down to his legs (AR 37).  He took a variety of medications to control the pain, and had regularly scheduled injection therapy (AR 38-39).  Deiss testified he also suffered from rheumatoid arthritis in his fingers and had continuous pain (AR 38).  He claimed his knuckles froze and he was unable to grasp small objects (AR 38).  He was able to sit with position changes, and was only able to stand for about fifteen minutes (AR 39).

Deiss testified that the primary reason he was unable to perform his job as a guidance counselor was the result of limitations due to the arthritic conditions in his hands (AR 40).  Out of an eight-hour day, five hours were spent on the computer (AR 40).  He claimed that his rheumatologist informed him that constant slight movement of his fingers irritated his arthritis, and would cause further deformity in his hands (AR 40).  He claimed his grip was no longer firm because he was unable to bend his knuckles appropriately, his hands were constantly swollen, and bony knobs were present on the knuckles (AR 43-44).  He did very little computer work, and when he did work on the computer, he used "a finger thing" (AR 44).  He wore shoes with velcro straps since he was unable to tie his shoes (AR 48).  Deiss also testified that he was unable to stay on his feet for any length of time and was unstable on his feet (AR 40).  He further claimed that he suffered from gastrointestinal problems which hindered his ability to work since at times he needed to use the bathroom up to twenty times a day (AR 51).

The vocational expert described Deiss' past work experience as skilled, with the exertional level of medium (AR 59).  The vocational expert testified that Deiss used a computer

to test and counsel students approximately four to five hours per day, participated in parent teacher conferences, sat for six hours, engaged in frequent reaching and occasional bending, and lifted up to 50 pounds (AR 59). He further testified that according to the *Dictionary of Occupational Titles*, this job was generally performed at the sedentary exertional level (AR 59). According to the vocational expert, the job could be performed with a sit/stand option and by someone who could only occasionally grasp, twist, and turn objects (AR 60-61). The vocational expert further testified however, that in order to perform the job of a guidance counselor, an individual would use a computer "a good four hours out of a work day," and if such an individual could only rarely or occasionally type on a computer, he could not perform the job (AR 63-65).

Following the hearing, the ALJ issued a written decision which found that Deiss was not entitled to a period of disability or disability insurance under the Act (AR 26). Deiss' request for review by the Appeals Council was denied making the ALJ's decision the final decision of the Commissioner (AR 6-10). He subsequently filed this action.

## II. STANDARD OF REVIEW

The Court must affirm the determination of the Commissioner unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence does not mean a large or considerable amount of evidence, but only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 564-65 (1988) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938)); *see Richardson v. Parales,* 402 U.S. 389, 401 (1971). It has been defined as less than a preponderance of evidence but more than a mere scintilla. *See Richardson,* 402 U.S. at 401; *Jesurum v. Secretary of the United States Dept. of Health and Human Servs.,* 48 F.3d 114, 117 (3d Cir. 1995).

## III. DISCUSSION

A person is "disabled" within the meaning of the Social Security Act if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).[2] The Commissioner uses a five-step evaluation process to determine when an individual meets this definition:

> In the first two steps, the claimant must establish (1) that he is not engaged in "substantial gainful activity" and (2) that he suffers from a severe medical impairment. *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987). If the claimant shows a severe medical impairment, the [Commissioner] determines (3) whether the impairment is equivalent to an impairment listed by the [Commissioner] as creating a presumption of disability. *Bowen*, 482 U.S. at 141. If it is not, the claimant bears the burden of showing (4) that the impairment prevents him from performing the work that he has performed in the past. *Id.* If the claimant satisfies this burden, the [Commissioner] must grant the claimant benefits unless the [Commissioner] can demonstrate (5) that there are jobs in the national economy that the claimant can perform. *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3rd Cir. 1985).

*Jesurum*, 48 F.3d at 117. Here, the ALJ resolved Deiss' case at the fourth step. He determined that Deiss' degenerative disc disease of the lumbar and cervical spine, rheumatoid arthritis, gastrointestinal disorders and chronic ischemia were severe impairments, but determined at step three that he did not meet a listing (AR 20). The ALJ found that he had the residual functional capacity to perform work that did not require exertion above the sedentary level and that allowed a sit/stand option (AR 24). The ALJ concluded that Deiss' impairments did not prevent him from performing his past work as a guidance counselor (AR 25). The ALJ also determined that Deiss' allegations regarding his limitations were not totally credible (AR 26). Again, we must affirm this determination unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g).

At step four, the ALJ must determine whether a claimant's residual functional capacity enables him to perform his past relevant work. The ALJ must perform the following analysis: (1) the ALJ must make specific findings of fact as to the claimant's residual functional capacity; (2)

---

[2] In order to be entitled to DIB under Title II, a claimant must additionally establish that her disability existed before the expiration of her insured status. 42 U.S.C. § 423(a), (c). The ALJ found that Deiss satisfied the insured status requirements of the Act through December 31, 2002 (AR 25).

the ALJ must make findings of the physical and mental demands of the claimant's past relevant work; and (3) the ALJ must compare the residual functional capacity to the past relevant work to determine whether the claimant has the level of capacity needed to perform the past relevant work. *See* 20 C.F.R. § 404.1561; *Social Security Ruling ("SSR")* 82-62, 1982 WL 31386 (1982); *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 120 (3rd Cir. 2000).

Here, the ALJ found that Deiss had the residual functional capacity to perform sedentary work with a sit/stand option (AR 24). The ALJ then found that his position as a guidance counselor was considered sedentary, and would allow a sit/stand option with only minor accommodations (AR 25). Finally, the ALJ concluded that Deiss could perform his past relevant work as a guidance counselor (AR 25). Deiss claims that the ALJ erred in his assessments of the medical evidence and his testimony in determining his residual functional capacity with respect to the use of his hands, and therefore, his determination at step four is not supported by substantial evidence.

"'Residual functional capacity is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).'" *Burnett*, 220 F.3d at 121 (quoting *Hartranft v. Apfel*, 181 F.3d 358, 359 n.1 (3rd Cir. 1999); *see also* 20 C.F.R. § 404.1545(a). An individual claimant's RFC is an administrative determination expressly reserved to the Commissioner. 20 C.F.R. § 416.927(e)(2). In making this determination, the ALJ must consider all evidence before him. *Burnett*, 220 F.3d at 121. Social Security Ruling 96-5p provides:

> The assessment is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, such as observations of lay witnesses of an individual's apparent symptomatology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings in light of the evidence.

*Soc. Sec. Rul*. 96-5p (1996), 1996 WL 374183 *5.

There is no dispute that Deiss' position as a guidance counselor requires him to use a computer approximately four to five hours per day. Deiss testified to such usage, and the

11

vocational expert confirmed that the position would require computer usage "a good four hours out of a work day" (AR 64, 109). The critical issue therefore, is whether the ALJ's conclusion that Deiss was capable of utilizing his computer four to five hours per day was supported by substantial evidence. In this regard, the evidence showed that in November 1999, Dr. Concilus observed changes in the fingers of both hands consistent with arthritis (AR 443). When seen by Dr. Hope, the consulting examiner, in November 2000, Deiss reported that his hand symptoms had stabilized and his deformities stopped developing after he stopped using a computer (AR 339). He further reported that although his hands had not bothered him for the past two years, he would suffer intermittent swelling following home repair activities and gardening, and that he had difficulty with buttons and opening jar lids (AR 340). Dr. Hope observed boutonniere deformities of the index and little fingers bilaterally, with early changes in the ring fingers (AR 341). Heberden's nodes[3] were present bilaterally, and fine motor coordination in both hands was slightly diminished (AR 341-342). Although light touch sensation was intact and symmetrical, Deiss exhibited a decreased range of motion of his fingers (AR 348-349). Dr. Hope diagnosed Deiss with rheumatoid arthritis with joint deformities of the hand and degenerative arthritis of the hand (AR 342). She opined that he could not perform handling or fingering maneuvers, and had limited use of his hands due to the superimposed deformities of the rheumatoid arthritis and osteoarthritis (AR 342, 344-345).

In January 2001, Dr. Kumar, the non-examining consultant, opined that Deiss had some limitations in his handling and fingering abilities (AR 431). Dr. Spahn, who was a treating physician, opined in July 2001 that Deiss had no ability to use his hands for fine manipulation, and that "severe arthritis of [the] fingers [made] writing and typing difficult" (AR 526-527). Deiss testified at the hearing that the primary reason he was unable to perform his job was due to the limited use of his hands, in that he was unable to bend his knuckles appropriately, his hands

---

[3]Heberden's nodes are small hard nodules, usually located at the distal interphalangeal articulations of the fingers and are associated with interphalangeal osteoarthritis. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1052 (25th ed. 1974).

swelled and bony knobs were present on the knuckles (AR 43-44). He further testified that he wore velcro shoes since he was unable to tie his shoelaces (AR 48).

In fashioning Deiss' RFC with respect to his hand limitations, the ALJ noted that Dr. Concilus had observed changes in his fingers consistent with arthritis, and that Dr. Hope noted deformities of his hands with slightly diminished fine motor coordination (AR 22-23). The ALJ rejected Dr. Hope and Dr. Spahn's opinions that Deiss was limited to a total of less than eight hours of standing, walking and sitting, on the basis that these "extreme limitations" were not supported by Dr. Hope's examination or Dr. Spahn's treatment notes (AR 24). The ALJ gave more weight to Dr. Kumar's RFC assessment since he concluded that it was more consistent with the medical evidence (AR 24).

The ALJ rejected Deiss' testimony regarding the limited use of his hands, and noted that Deiss testified that his pain had lessened (AR 24). He also noted that Dr. Concilus found normal strength in April 2001, and in March 2001, Deiss had sufficient strength to climb a ladder (AR 24). He further observed that Dr. Reidy noted a lessening of complaints and tingling in the right hand and arm, and that Dr. Hope observed only slightly diminished fine motor coordination, with light touch sensation intact and symmetrical (AR 24). Following his analysis of this evidence, the ALJ stated:

> ...The expert testified that an individual with the residual functional capacity adopted here could perform the work of guidance counselor as generally performed in the national economy. The job includes the need to use the computer up to four hours per day. I find that the medical evidence supports a finding that the claimant has the capacity to do this work. Exertionally, it is within his range. The evidence concerning problems with his hands does not rule out the use of a computer. I conclude that claimant can perform his past work as a guidance counselor and therefore is not disabled.
>
> The expert testified that a person who had marked restrictions in grasping or was able to use the computer only one-third of the day could not do the work of a guidance counselor. However, I do not find that the evidence supports this limitation. The claimant has some arthritis of the hands, but he is able to drive, lift his granddaughter, and perform some household chores, consistent with the residual functional capacity adopted here (AR 25).

Upon review of the entire record, we agree with Deiss that the ALJ's RFC determination is not supported by substantial evidence. We first observe that the ALJ failed to discuss Dr. Spahn's conclusions in June 2001 that Deiss had no fine manipulation abilities or that writing and typing would be difficult due to his severe arthritis. As a treating physician, his opinion is entitled to great weight and can only be rejected on the basis of contrary medical evidence. *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3rd Cir. 1988). An ALJ must articulate in writing his or her reasons for rejecting such evidence. *Cotter v. Harris*, 642 F.2d 700, 705 (3rd Cir. 1981). In the absence of such an indication, "the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." *Id*. The Third Circuit recently reiterated this obligation, stating that "the ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." *Schaudeck v. Comm'r of Social Security Admin.*, 181 F.3d 429, 433 (3rd Cir. 1999) (citations omitted). Here, the ALJ failed to explain his rejection of this evidence.

We further find that the ALJ selectively relied on those findings of Dr. Hope which supported his determination, while apparently rejecting those which did not without explanation. Specifically, the ALJ relied upon Dr. Hope's findings that Deiss had only slightly diminished fine motor coordination, and his light touch sensation was intact and symmetrical (AR 24). He did not address however, her findings as to Deiss' limited range of motion, or more critically, her opinion that he could not perform handling or fingering maneuvers, and had limited use of his hands due to the superimposed deformities of the rheumatoid arthritis and osteoarthritis (AR 342, 344-345). We recognize that a consulting physician's opinion is not entitled to the same amount of deference accorded a treating physician's opinion. *Mason v. Shalala*, 994 F.2d 1058, 1067 (3rd Cir. 1993). Nonetheless, where competent evidence supports a claim, the ALJ must explicitly weigh the evidence and explain a rejection of the evidence. *Schaudeck*, 181 F.3d at 435. Fairly read, Dr. Hope's entire report tends to support Deiss' disability claim with respect to his hands.

Moreover, we observe that Dr. Kumar, the state agency non-examining physician, opined that Deiss had limitations in his ability to engage in handling/gross manipulations and fingering/fine manipulations (AR 431). We recognize that Dr. Kumar did not render an opinion on Deiss' ability to use a computer; nonetheless, his assessment supports the conclusions of Drs. Spahn and Hope.

Finally, the ALJ relies on Deiss' limited activities to support the inference that he is capable of using a computer four hours per day. The ALJ found that because Deiss was able to drive, lift his granddaughter, and perform some household chores, he was able to use a computer for four hours per day. We cannot agree with this assessment of the evidence. Quite simply, these limited activities do not demonstrate an ability to engage in the demands of using a computer four to five hours a day for five days per week. Furthermore, the fact that Deiss may sporadically engage in certain household chores does not support the ALJ's determination that he is capable of performing his job as a guidance counselor. *See Smith v. Califano*, 637 F.2d at 971-72 ("Disability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity. ... It is well established that sporadic or transitory activity does not disprove disability."). Deiss' limited activities do not support an inference that he has the RFC to use a computer four hours per day.

We must now determine whether to remand the case for further administrative proceedings or reverse and direct an award of benefits. The decision to reverse the decision of the Commissioner and direct an award of benefits should only be made "when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits." *Podedworny v. Harris*, 745 F.2d 210, 221 (3d Cir. 1984). In this instance, we find that a remand is appropriate. On remand, the ALJ is directed to address the entire medical opinions of Drs. Spahn and Hope, and reevaluate Deiss' credibility in light of his reexamination of the medical evidence. The ALJ is free to seek additional evidence and/or call a vocational expert if he feels it is necessary.

15

## IV. Conclusion

Based upon the foregoing reasons, the Plaintiff's motion for summary judgment shall be denied, and the Defendant's motion for summary judgment shall be denied. The matter shall be remanded to the ALJ for further proceedings consistent with this Memorandum Opinion.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| RAYMOND F. DEISS, | ) |
| Plaintiff, | ) |
| v. | ) Civil Action No. 04-380 Erie |
| JO ANNE B. BARNHART,<br>Commissioner of Social Security, | ) |
| Defendant. | ) |

**ORDER**

     AND NOW, THIS 14th day of July, 2005, for the reasons set forth in the accompanying Memorandum Opinion,

     IT IS HEREBY ORDERED that Plaintiff's Motion for Summary Judgment [Doc. No.7] is DENIED and Defendant's Motion for Summary Judgment [Doc. No. 9] is DENIED.  The case is hereby REMANDED to the Commissioner of Social Security for further proceedings consistent with the accompanying Memorandum Opinion.  The clerk is directed to mark the case closed.

                                                                                            s/ Sean J. McLaughlin
                                                                                            United States District Judge

cm: All parties of record. ____